IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

TIMOTHY CHERRY,

Defendant.

CRIMINAL CASE NO.

1:18-CR-00503-SCJ-JFK

## **REPORT AND RECOMMENDATION**

Pending before the court are Defendant Timothy Cherry's motion [Doc. 14] to suppress evidence and motion [Doc. 15] to suppress statements.  An evidentiary hearing was held on September 24, 2019, on Defendant's motions to suppress.[1] [Doc. 44].  In Defendant's post-hearing brief, he contends that the officers lacked reasonable suspicion for the Terry[2] stop on November 20, 2018, which resulted in the warrantless seizure of the firearm upon which the charges in the superseding indictment [Doc. 30] are based and, accordingly, that the firearm is not admissible in evidence as fruits of the unlawful detention.  [Doc. 45 at 7-12].  Defendant also argues that his subsequent

_____

[1]Citations to the transcript of the hearing are:  (Tr. at ).

[2]See Terry v. Ohio, 88 S. Ct. 1868 (1968).

statements, which he made without receiving Miranda[3] warnings, also constitute fruits of the unlawful stop and seizure of the firearm and are inadmissible in evidence. [Id. at 12-13]. In response, the Government contends that the officers did have a reasonable suspicion to support the Terry stop and that the warrantless seizure of the firearm fell within the exception for searches incident to arrest and/or as an inventory search of Defendant's property. [Doc. 46 at 4-10]. And the Government contends that Defendant's statements made at the scene of his detention and arrest were spontaneous, voluntary statements not made in response to interrogation.[4] [Id. at 10-12]. In his reply brief, Defendant reiterates that the officers lacked reasonable suspicion for the Terry stop and that his stop and arrest were unlawful but does not otherwise respond to the Government's arguments that the firearm was seized incident to his arrest or as part of an inventory search. [Doc. 47 at 6]. With respect to the statements made by Defendant at the scene of the stop and arrest, Defendant agrees that the statements were not made in response to interrogation but argues that the

---

[3] See Miranda v. Arizona, 86 S. Ct. 1602, 1630 (1966).

[4] The Government identifies these statements by reference to time markers on the body camera recording identified as "Brown Initial Contact" introduced into evidence at the hearing. [Doc. 36] (Tr. at 16-18; Gov't Exhibit 1).

statements should be suppressed as fruits of the unlawful detention and arrest. [Id. at 6].[5]

## I.   Background Facts

On November 20, 2018, at approximately 6:30 p.m. to 6:40 p.m., Sr. Patrol Officer ("P.O.") Eugene A. Idlett, Jr., City of Atlanta Police Department ("APD"),[6] received a call on his cell phone from Imina, the manager of the Circle K convenience store located off of Joseph E. Lowry Boulevard, in Atlanta. (Tr. at 3, 5, 8, 25). P.O. Idlett, as part of his work, met the owners and workers in the various businesses in Zone 1 and provided his cell phone to these individuals so that they could contact him if needed. (Tr. at 5-6, 24-25). Imina advised the patrol officer that "the male that was

---

[5]While Defendant was being transported to police headquarters following his arrest, he apparently made comments to the officers accusing them of stealing his property and being thieves. (Tr. at 15-16, 50-51). One of the officers responded, "I was like if I'm a thief, how did you get the gun, where did you get the gun from." (Tr. at 16, 51). Evidentiary hearing testimony indicates that Defendant did not respond to that inquiry. (Tr. at 16, 51). The Government confirms that Defendant did not respond to the inquiry. [Doc. 46 at 4 n.2]. Because there is no statement by Defendant identified by the Government that it intends to introduce at trial flowing from this exchange, it will not be further addressed *infra*.

[6]At the time of the hearing, P.O. Idlett had been a senior patrol officer for two years and had been with APD for eight years, all working in Zone 1 (an area located west of Northside Drive to I-20). (Tr. at 3-4). In November 2018, he was in the Crime Suppression Unit ("CSU"), usually on duty 3:00 p.m. to 11:00 p.m. (Tr. at 4).

involved in a robbery at another store was inside his store" and asked the patrol officer to come to the store.  (Tr. at 5, 27, 36-37).  P.O. Idlett testified that on November 17, 2018, a nearby convenience store (owned by the same person who owned the Circle K) had been robbed and that, when Imina called him the first time to advise that the suspected robber was in his store, Imina also texted to him three photographs of the suspect taken from the surveillance camera at the store which had been robbed.[7]  (Tr. at 7, 25-27, 55-56).  When Imina called P.O. Idlett with the same information before November 20, 2018, due to the fact that the patrol officer either was not at work or too far away, he was not able to respond to the Circle K.  P.O. Idlett did not recall the specific dates of the prior calls from Imina.  (Tr. at 7-8, 25-26, 49-50).  During one of the calls, Imina advised the patrol officer that the suspected robber was in the Circle K all the time, and the patrol officer asked Imina to call again if the male returned. Imina did not provide a physical description of the male.  (Tr. at 28, 31).  November 20, 2018, was the first time the patrol officer was able to respond to the store.  (Tr. at 7-8).

---

[7]The robbery had received news coverage because a store clerk was shot.  (Tr. at 55-56).

4

Prior to receiving the three photographs from Imina, which had been distributed by the owner of the store that had been robbed to his other stores, on November 17, 2018, a "BOLO came out from [the APD] Robbery Unit describing the incident and with pictures from the incident" which P.O. Idlett reviewed on his office computer.[8] (Tr. at 6, 27-28; Gov't Exhibit 2). These were the same three photographs provided by Imina. (Tr. at 6-7, 27-28). P.O. Idlett "had [the photos] twice," and, although he did not print out the photos, the patrol officer did save the BOLO photos to a folder on his cell phone so that he could access them if needed. The patrol officer had no specific recollection of looking at the photos any other time. (Tr. at 28-29, 33-36).

After receiving the call from Imina on November 20, 2018, P.O. Idlett and his partner, P.O. Nicole Brown, traveled, in a marked police vehicle, to the Circle K but did not activate the siren or lights. They parked directly in front of the store, which had large windows allowing a view into and out of the store. (Tr. at 8, 37-38). As the patrol officers, attired in tactical gear clearly marked as law enforcement, exited their vehicle, they activated their body cameras enabling both video and audio recording. (Tr. at 16-23, 39-41; Gov't Exhibit 1). Upon entering the store, P.O. Idlett observed a black male, later identified as Defendant Cherry, standing at the counter (which had

---

[8]"A BOLO is Be On The Lookout." (Tr. at 6).

a direct view out the front of the store) buying cigarettes.  Defendant was standing

with his back to the door.  (Tr. at 8, 39, 41).  Defendant had "like the 90's fanny pack[

], but it was across [one] shoulder."  (Tr. at 12).  P.O. Idlett stated that he "believed

it was him [in the BOLO].  From the nose structure, the color of the skin, I believed

it was him."  P.O. Idlett simply wanted to get Defendant identified.  (Tr. at 9, 42-43).

P.O. Idlett approached Defendant.  As Defendant turned around, P.O. Idlett was

standing nearby.  The patrol officer greeted Defendant, who greeted him back, and

"trying to be cordial . . .[,] asked [Defendant] if he had an I.D. on him."  (Tr. at 8-9,

43).  Defendant responded, no, and that he had nothing with his name with him.  (Tr.

at 9).  Defendant stated that his I.D. was at home and, when asked, advised that he

lived in the apartments next door.  (Tr. at 44).

At this time, P.O. Idlett had not observed a weapon or a suspicious bulge in

Defendant's clothing and had not been advised or observed Defendant commit a crime

or make any threats.  (Tr. at 32-33, 42).  Defendant did not try to hide his face or make

an attempt to run.  (Tr. at 40-41).

Defendant asked what this was about, and P.O. Idlett responded, "We'll talk a

little bit, but I just need to detain you for further investigation."  (Tr. at 9, 44-45).

When the patrol officer reached for Defendant's arm and attempted to place handcuffs

6

on him, "the fight was on" and a struggle with both patrol officers throughout the store continued for several minutes. (Tr. at 9-11, 44-46; Gov't Exhibit 1). Other officers responded to a call for assistance, and, with additional assistance, Defendant was eventually subdued, handcuffed and escorted outside the store where he received medical attention. (Tr. at 10-12, 46-47). During the struggle, Defendant's fanny pack was dislodged. (Tr. at 12). APD Officer Wert, who arrived in response to the call for assistance and who had assisted handcuffing Defendant, returned inside and secured the fanny pack from the store counter where it had been placed by either Officer Wert or P.O. Brown as Defendant was escorted outside. (Tr. at 12-14, 48-49).

Defendant was under arrest for obstruction. (Tr. at 13-14). While Defendant was being treated for his injuries from the struggle, P.O. Idlett, standing with Defendant, removed the items from the fanny pack to inventory. (Tr. at 14). APD policy required an inventory of an arrestee's property before being transported to jail to protect against allegations of theft. (Tr. at 14). In the fanny pack, the patrol officer found a loaded handgun. (Tr. at 14). Defendant was then transported by P.O. Idlett and P.O. Brown to APD headquarters. (Tr. at 14).

Additional facts will be set forth as necessary during discussion of the motions to suppress.

## II.   Discussion

Defendant seeks to suppress the firearm found in his fanny pack and any statements that he made during the events at the Circle K on November 20, 2018.

### a.   Credibility of Witnesses

Because of P.O. Idlett's failure to remember details about his receipt of the BOLO photographs, Defendant contends that the patrol officer's testimony that he thought Defendant was the individual in the photographs is not credible. [Doc. 45 at 10-11]. Although the court will address *infra* specific arguments regarding witness credibility, the following generally guides the court's consideration of Defendant's arguments. "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). In weighing the credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." Id. at 750; see also United States v. Wein, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance and conduct of each witness, the manner

8

in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand"). And, unless the evidence "'is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" or unless the factfinder's determinations appear to be "'unbelievable[,]'" a reviewing court should accept those findings of fact. Ramirez-Chilel, 289 F.3d at 749 (citations omitted); accord United States v. Griffith, 397 Fed. Appx. 613, 617-18 (11th Cir. 2010). Having observed P.O. Idlett's testimony, the court finds that his statement that he believed Defendant was the individual in the BOLO photographs is credible.

### b.   Detention and Search

Law enforcement agents may briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity. See Terry, 88 S. Ct. at 1879-80; United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (same). "[T]he 'reasonableness' standard requires that a police officer 'be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion.'" United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996) (quoting Terry, 88 S. Ct. at

9

1880); <u>see also</u> <u>United States v. Blackman</u>, 66 F.3d 1572, 1576 (11th Cir. 1995) ("The reasonableness of the officers' conduct must be judged against an objective standard: would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate.") (citations and internal quotation marks omitted). Such brief investigatory stops do not require probable cause. See <u>United States v. Sokolov</u>, 109 S. Ct. 1581, 1585 (1989). "While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." <u>Lindsey</u>, 482 F.3d at 1290 (quoting <u>Illinois v. Wardlow</u>, 120 S. Ct. 673, 675-76 (2000)) (internal quotation marks omitted); <u>see also</u> <u>Mikell</u>, 102 F.3d at 475. "Also, '[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity,' . . . even if such activity is 'seemingly innocuous to the ordinary citizen.'" <u>Lindsey</u>, 482 F.3d at 1290 (citations omitted).

In <u>United States v. Smith</u>, 201 F.3d 1317 (11th Cir. 2000), the Eleventh Circuit Court of Appeals stated, "In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention." <u>Id.</u> at 1323 (citations omitted); <u>see also</u> <u>Sokolov</u>, 109 S.

Ct. at 1585 (the determination as to the initial validity of the stop is based on a consideration of the totality of the circumstances).  And, when considering the facts and information known to the agents, the court should view all of the circumstances "in the light of the officers' special training and experience." Smith, 201 F.3d at 1323 (citations omitted); accord United States v. Reed, 402 Fed. Appx. 413, 415 (11th Cir. 2010) ("In making these commonsense judgments, '[t]he stopping officer is expected to assess the facts in light of his professional experience . . . .'") (citation omitted); United States v. Knight, 336 Fed. Appx. 900, 902 (11th Cir. 2009) ("Great deference is given to the judgment of trained law enforcement officers on the scene.") (citations and internal quotation marks omitted).

Initially the court must determine whether the officer's action in detaining Defendant "was justified at its inception," that is, was there a reasonable suspicion of criminal activity.  United States v. Acosta, 363 F.3d 1141, 1144 (11th Cir. 2004) (citations and internal quotation marks omitted); United States v. Turner, 684 Fed. Appx. 816, 820 (11th Cir. 2017) (to determine whether an investigatory detention is legal, the court asks "two questions: (1) 'whether the [detention] was justified at its inception,' and (2) 'whether the officer's actions were reasonably related in scope to

11

the circumstances that justified the [detention] in the first place'") (citation omitted).[9]

A detention occurs "only when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained.  Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." United States v. Mendenhall, 100 S. Ct. 1870, 1877 (1980).  As the Supreme Court clarified in California v. Hodari D., 111 S. Ct. 1547 (1991), absent acquiescence to the show of authority, a seizure under the Fourth Amendment has not occurred. Id. at 1555-57, 62; see also United States v. Jordan, 635 F.3d 1181, 1186 (11th Cir. 2011) ("The ultimate inquiry remains whether a person's freedom of movement was restrained by physical force or by submission to a show of authority.").  There is no dispute in this case that Defendant was detained when P.O. Idlett advised Defendant that he was being detained, placed his hand on Defendant and attempted to handcuff Defendant.  (Tr. at 9, 43-45).  The only facts that the court can consider in determining if reasonable suspicion justified the detention are those known to the patrol officer at that time -

---

[9]Because of the circumstances in this case, as discussed infra, the second issue set out in Turner is not before the court.

12

which, contrary to the Government's contention [Doc. 46 at 8 n.4], does not include

Defendant's response to being detained by P.O. Idlett.[10]

P.O. Idlett knew that, on November 17, 2018,[11] a convenience store had been

robbed and that a store clerk had been shot during the robbery.  (Tr. at 5-7, 27-28, 55-

56; Gov't Exhibit 2).  On November 17, 2018, the patrol officer received a "BOLO

[that] came out from our Robbery Unit describing the incident and with pictures from

the incident" which P.O. Idlett reviewed on his office computer, and he downloaded

the photos to a folder on his cell phone in case he needed them for future reference.[12]

(Tr. at 6, 27-28; Gov't Exhibit 2).  After he received the BOLO, but before November

---

[10]If Defendant had attempted to flee or avoid contact with P.O. Idlett *before* the patrol officer's statements and actions detained Defendant, then those actions would have properly been considered in evaluating reasonable suspicion.  See Turner, 684 Fed. Appx. at 820-21 ("Although 'officers cannot improperly provoke . . . a person' in order to justify a stop, . . . they are otherwise entitled to rely on a suspect's reaction to their presence.").  Defendant's reaction to being detained, while going to the existence of probable cause to support his arrest, do not inform the court's decision on reasonable suspicion.

[11]In his post-hearing brief, Defendant states that the robbery occurred on November 16, 2018, but offers no citation to the record for that date.  [Doc. 45 at 10-11].  Whether the robbery occurred on November 16 or November 17 is not material to the resolution of the motions to suppress.

[12]P.O. Idlett did not specifically recall looking at the photos in the folder on his cell phone.  (Tr. at 36).

13

20, 2018, P.O. Idlett received at least two calls from Imina, the manager of the Circle K located off of Joseph E. Lowry Boulevard,[13] advising that the suspected robber was in his store at that time, and Imina sent the patrol officer, by text, the same three photographs of robber in the BOLO which had been obtained during the robbery at the other convenience store.[14]   (Tr. at 5-7, 27-31, 36-37).   Imina advised that the suspected robber was often in the Circle K.  (Tr. at 28, 31).  On November 20, 2018, Imina called P.O Idlett and advised that the suspected robber was in the Circle K, and P.O. Idlett and his partner, P.O. Brown, who were nearby, went to the store.  (Tr. at 8-9, 36-37).  After they arrived and entered the Circle K, P.O. Idlett stated that he "believed it was him [in the BOLO].  From the nose structure, the color of the skin, I believed it was him."  (Tr. at 9, 42-43).  In order to identify Defendant, P.O. Idlett greeted Defendant, who greeted him back, and "trying to be cordial . . .[,] asked [Defendant] if he had an I.D. on him."  (Tr. at 8-9, 43).  Defendant responded, no, and that he had nothing with his name with him.  (Tr. at 9).  Defendant stated that his I.D. was at home and, when asked, advised that he lived in the apartments next door.  (Tr.

---

[13]P.O. Idlett had met Imina as part of his official duties and had provided Imina with his cell phone in order to contact the patrol officer if needed.  (Tr. at 5-6, 25-26).

[14]Imina had the photographs because the owner of both the store that was robbed and of the Circle K had distributed them to all of his stores.  (Tr. at 27-28).

at 44).   Defendant was then, as noted, detained by the patrol officer advising Defendant that he was being detained, grabbing Defendant's arm and attempting to place handcuffs on him.[15]  (Tr. at 9, 43-45).

The Government relies on the information that P.O. Idlett received from Imina that the robbery suspect was in the Circle K and on P.O. Idlett's testimony that he believed Defendant matched the photograph of the robbery suspect to support a finding of reasonable suspicion. [Doc. 46 at 5-7].  Defendant challenges the reliability of P.O. Idlett's testimony and asserts that, because the Imina was not providing a "tip" about a crime and because Government did not call Imina to testify, Imina's information could not be relied on by the patrol officer to establish reasonable suspicion.  Defendant offers no legal support for the latter arguments.[16]  [Doc. 45 a 10-

---

[15]Under the circumstances, that is, the patrol officer believing that Defendant may be the suspect in a convenience store robbery during which a clerk was shot, P.O. Idlett's attempt to restrain Defendant with handcuffs was justified as a safety precaution.  See United States v. Williams, 185 Fed. Appx. 866, 869 (11th Cir. 2006) ("officers may handcuff or otherwise restrain a suspect during an investigatory stop when such action is reasonable under the circumstances to protect themselves or the public, or to maintain the status quo") (citations omitted).

[16]Defendant's citation of the facts that do not support a finding of reasonable suspicion are not determinative of the issue before this court.  [Doc. 45 at 9-10]. There is no dispute that P.O. Idlett (and, for that matter, Imina) did not see Defendant committing a crime, did not see him in possession of a firearm or see a bulge supporting suspicion of the presence of a firearm and that Defendant, prior to being

15

12; Doc. 47 at 2-3 & n.1].  The court finds that Defendant sets too exacting a standard for evaluating P.O. Idlett's reliance on the report from Imina and the BOLO in urging the court to find that reasonable suspicion is lacking in this case.

The court first addresses P.O Idlett's reliance on the telephone call from Imina and report that the suspected robber was again in the Circle K.  The patrol officer's reliance on that information was justified by the facts.  He knew and had interacted with Imina on a number of occasions in the past, such that Imina was not an anonymous tipster. (Tr. at 5-6, 24-25). See United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000) ("Unlike the anonymous tipster, a witness who directly approaches a police officer can also be held accountable for false statements."); and see United States v. Kirton, 2019 WL 6868798, at *10 (N.D. Ga. October 18, 2019), report and recommendation adopted by 2019 WL 6840132 (N.D. Ga. December 16, 2019).  The first time that Imina provided the information, he also sent to P.O. Idlett the three surveillance photographs - which matched the BOLO photographs that the patrol officer already had seen - and that information, along with the fact that the suspect was often in the Circle K, provides a basis for the police officer crediting Imina's belief

---

detained, did not avoid contact with the patrol officer and answered the patrol officer's questions.  (Tr. at 8-9, 32-33, 40-42).

16

that the male in the Circle K was the robbery suspect.  (Tr. at 5, 25-27, 36-37, 55-56).

See United States v. Deering, 296 Fed. Appx. 894, 899 (11th Cir. 2008) (noting that

the informant "showed a detailed knowledge" and provided personal observations of

the activity under investigation).  And P.O. Idlett did not rely solely on Imina's belief

but determined independently that Defendant matched the BOLO photographs thereby

corroborating Imina's information.  (Tr. at 9).  See United States v. Martin, 297 F.3d

1308, 1314 (11th Cir. 2002) (noting that "'sufficient independent corroboration of an

informant's information'" can provide a basis for establishing veracity) (citation

omitted)).

Additionally, P.O. Idlett's independent reliance on the BOLO provides "a

minimal level of objective justification for making the [Terry] stop" of Defendant.

Lindsey, 482 F.3d at 1290 (citation and internal quotation marks omitted).  In United

States v. Akinlade, 519 Fed. Appx. 529 (11th Cir. 2013), relied on by the Government,

the Eleventh Circuit Court of Appeals considered whether a BOLO for an unidentified

male suspected of bank fraud provided reasonable suspicion for an investigatory

detention of the defendant.  The court began its discussion noting that "'if a flyer or

bulletin has been issued on the basis of articulable facts supporting a reasonable

suspicion that the wanted person has committed an offense, then reliance on that flyer

17

or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information.'" Id. at 533-34 (quoting United States v. Hensley, 105 S. Ct. 675, 682 (1985)) (alteration deleted; internal citations omitted).  There are facts distinguishing Akinlade from the case before this court, as pointed out by Defendant [Doc. 47 at 2-5]; however, the court need not rely on the actual reasonable suspicion finding in Akinlade to conclude that the facts in this case support a finding of reasonable suspicion.  Other decisions in this circuit, as well as by other district courts, support the court's finding that P.O. Idlett had reasonable suspicion to conduct an investigatory stop in this case.

In United States v. Webster, 314 Fed. Appx. 226 (11th Cir. 2008), the court rejected the defendant's argument that the description in the BOLO of the suspect vehicle and the officer's failure to investigate the BOLO further failed to establish reasonable suspicion for a Terry stop.  A police department "issued a BOLO for a dark-colored vehicle with something to the effect of 'Down South Customs' written on the rear window" as being related to a shooting earlier in the day. Id. at 227.  The defendant was observed "driving a blue Pontiac Grand Am with a decal on the rear window advertising his sister's business, 'Down and Dirty Customs.'" Id.  Because the officer believed the vehicle matched the BOLO, he followed and eventually

18

stopped the vehicle and, after conducting a pat down of the driver (defendant), found a firearm.  Id.[17]  The court affirmed the lower court's finding of reasonable suspicion and rejected the defendant's argument that the BOLO "was too vague to provide a minimal, objective justification for the Terry stop because there are too many vehicles that could have matched the description" and stated, although agreeing "that the BOLO description was far from a model of clarity," that "it was [not] prohibitively vague" and "sufficiently narrows the field of suspected vehicles so as to support reasonable suspicion . . . ."  Id. at 229.  And the court rejected the defendant's argument that the officer lacked reasonable suspicion because he failed to call dispatch to confirm the BOLO before conducting the stop.  If the officer had done so, he would have learned that an updated BOLO's description of the vehicle did not match the defendant's vehicle and probably would not have stopped the vehicle resulting in the arrest of the defendant.  Id.  The court stated that its "review of reasonable suspicion is based on the information available to the officer at the time of

---

[17]The officer had not observed any traffic violations and could not recall if the BOLO provided a particular vehicle make and model, "but he believed that the description was 'a dark-colored vehicle, unknown make and model' with 'something to the effect of Down South Customs' written on the rear window."  Id. at 228.  The officer also "testified that BOLOs based on witness descriptions often lead to 'general lookout[s]' because witnesses are 'unsure of the make and model.'"  Id.

the stop, . . . and [the officer] was not aware of the updated BOLO description when he stopped" the defendant.  Id.  Likewise, in this case, although P.O. Idlett could not recall details about his receipt of and review of the BOLO photographs, the evidence indicates that he received and examined the photographs on at least two occasions between November 17 and November 20, 2018.  (Tr. at 6-7, 27-31).  P.O. Idlett also explained why he thought that Defendant matched the BOLO, that is, based on Defendant's "nose structure, the color of the skin."  (Tr. at 9).  Also, as evident from the videos of the incident at the Circle K, the lighting in the store was bright and P.O. Idlett was standing close to Defendant, able to clearly see him, when he, the patrol officer, decided that Defendant matched the BOLO.  (Tr. at 8-9, 39-43; Gov't Exhibit 1).  And, although Defendant points out that he was not the individual in the photograph, that fact is not pertinent to the reasonable suspicion calculus because P.O. Idlett did not know that to be the case at the time of the stop.

And, in Hargrove v. City of Montgomery, 2012 WL 917293 (M.D. Ala. March 19, 2012), the court found that a police officer was entitled to qualified immunity against claims of unlawful detention and arrest arising out of a Terry stop based on a

20

BOLO.[18]  The plaintiff/arrestee, Hargrove, was a thirty-nine year old black male, 5'

7" tall and weighing 185 pounds with a fade haircut and a clean-shaven face.  Id., at

*2.  He was dressed in shorts, black shirt with a design on the front and a dark blue

Boston Red Sox baseball cap.  Id.  Along with his father, Hargrove, in a 1995 Red

Jeep Cherokee sport utility vehicle traveled to a Compass Bank branch to conduct

business at the drive through.  Id.  The bank branch had recently been robbed, and a

police officer directed Hargrove to leave and go to another bank branch to complete

his transaction.  Hargrove did so, traveling to a nearby Compass Bank.  Id.  During

this time a BOLO was issued "for a black male suspect, approximately fifty years old,

with a gray short afro haircut and mixed gray facial hair. . .[,] wearing a black shirt

and a dark blue baseball cap with writing on it and . . . carrying the stolen property in

a white envelope . . . [and] driving a brown Ford truck."  Id., at *3.  Another police

officer spotted Hargrove and his father in the Jeep and saw it pull into the branch of

the Compass Bank.  Id.  Based on the BOLO, the officer followed, and, when the

---

[18]The court acknowledges that the court's determination rested on a finding that
the officer had "an *arguable* basis for the seizure" which means that "'reasonable
officers in the same circumstances and possessing the same knowledge as [the officer
in question] could have believed that probable cause [or reasonable suspicion] existed
to arrest [or briefly detain] [the] [p]laintiff.'"  Id., at *6 (citation omitted; emphasis in
original).  This standard is similar to but not the same standard as applied in this case.

officer stopped and exited his vehicle, Hargrove was standing outside the Jeep talking on his phone. Id. Although the details of the events following the officer's approach to Hargrove were disputed, Hargrove was restrained and handcuffed. Id.

In ruling against Hargrove, the court found that "[a]rguable reasonable suspicion existed in this case based upon a comparison of [Hargrove] to the BOLO report as well as the circumstances in which [the officer] first encountered [Hargrove]." Id., at *6. The court noted that Hargrove's "appearance did match the BOLO in some respects[,]" that is, both men "were mid-aged black males wearing black tee shirts and dark blue baseball caps with writing on them." Id., at *7. The court further noted that the officer first saw Hargrove in the red Jeep Cherokee - "perhaps somewhat similar to the BOLO's description of a brown truck" - preventing him from observing Hargrove's "height, weight, build, hair color, age, etc."[19] Id. But, the significant point to be drawn from the court's discussion is that, as in Webster, exactitude is not required in basing reasonable suspicion on a description or a photograph in a BOLO of a suspect. See United States v. Romo-De La Rosa, 2010

---

[19]The court did not address the fact that the officer would have been able to verify those descriptors when he observed Hargrove standing outside the Jeep before the officer detained Hargrove. Arguably, Hargrove only matched the descriptors specified by the court: "mid-aged black males wearing black tee shirts and dark blue baseball caps with writing on them." Id., at *7.

WL 4595814, at **2-3 (W.D. Tex. November 2, 2010) (the court rejected the defendant's argument that reasonable suspicion did not exist because the BOLO did not exactly match his description, stating that "exact descriptions are not required" for a finding of reasonable suspicion") (citations omitted).[20]   Defendant Cherry's appearance did not have to be an exact match with the BOLO photographs - or, for that matter, the BOLO photographs did not have to be professional quality - for the court to find that P.O. Idlett's belief that Defendant was the robbery suspect provided reasonable suspicion.

Additionally, the court found significant that Hargrove drove on to the parking lot of another branch of the Compass Bank because "this behavior could have been

[20]In Emanuel v. People of the Virgin Islands, 2018 WL 3005931 (D. V.I. June 13, 2018), the court addressed the defendant's challenge to his detention which was based on his resemblance to a photograph in a BOLO but who was ultimately determined not to be that individual.  The officer had received the BOLO at the start of his shift on January 22 and encountered the defendant at 4:00 a.m., on January 23, in a bar.  The officer saw the defendant, who avoided eye contact, as the officer entered the bar and subsequently when the defendant exited the bar and entered a vehicle, which did not match the vehicle in the BOLO.  Id., at **1, 3, 5.  The court rejected the defendant's argument that the BOLO not could provide reasonable suspicion and relied on a number of decisions finding reasonable suspicion despite dissimilarities between the BOLO and the physical appearance of the defendant.  Id., at *6 (listing cases).  The court held that "the distinctions between [the defendant] and the BOLO suspect do not eviscerate the reasonableness of [the officer's] reasonable suspicion that [the defendant] was the individual described in the BOLO."  Id.

perceived as [Hargrove] plotting a second bank robbery of yet another branch of the [bank]."  See Hargrove, 2012 WL 917293, at *7.  Likewise, in this case, the fact that Defendant was observed in another convenience store on repeated occasions, within days after the robbery of the other convenience store which was owned by the same person, would have supplied an additional basis for the patrol officer's belief that Defendant matched the photograph of the robber.

Based on the totality of the circumstances, the court concludes that the Government "'articulate[d the required] minimal, objective justification for the stop.'" Webster, 314 Fed. Appx. at 229 (citation omitted).  For these reasons, the court finds that P.O. Idlett lawfully attempted to conduct a Terry stop for the purpose of identifying Defendant.  As noted, Defendant's only challenge to the seizure of the firearm is that it constituted fruits of the unlawful Terry stop.  [Doc. 45 at 12; Doc. 47 at 5-6].  The Government contends that the warrantless seizure was authorized as either a search incident to arrest or as an inventory search.  [Doc. 46 at 8-10].  Having found that Defendant was lawfully detained and because he was then lawfully under arrest for obstruction, see United States v. Mitchell, 2019 WL 6462838, at *30 (N.D. Ga. June 25, 2019) ("The defendant's refusal to comply with an officer's lawful directive or command amounts to obstruction under Georgia law.") (citation omitted),

24

report and recommendation adopted by 2019 WL 3854307 (N.D. Ga. August 16, 2019); and see O.C.G.A. § 16-10-24(a), Defendant's arguments in support of suppression of the firearm fail.  The court will not address the Government's additional arguments regarding the lawfulness of the seizure of the firearm.  See United States v. Lopez-Garcia, 565 F.3d 1306, 1315 (11th Cir. 2009) (the defendant's "fruit of the poisonous tree argument plainly collapses since . . . his Fourth Amendment rights were never violated").

The court **RECOMMENDS** that Defendant's motion [Doc. 14] to suppress evidence **DENIED**.

### c.    Statements

Defendant seeks to suppress pre-Miranda statements that he made at the Circle K contending that, although the statements were spontaneous and voluntary, the statements constitute fruits of the allegedly unlawful detention requiring suppression. [Doc. 45 at 12-13; Doc. 47 at 6].[21]  With respect to Defendant's claim that the statements are inadmissible as being tainted by an illegal stop and arrest, because the

---

[21]As the court noted *supra*, the Government is not offering any statement by Defendant while he was being transported to the jail thereby mooting any suppression issue regarding P.O. Idlett's conversation with Defendant at that time.  See ftn. 5.

25

court found that the Defendant was lawfully detained and arrested, his statements do not constitute fruit of an unlawful arrest or search and seizure.  See Lopez-Garcia, 565 F.3d at 1315 (the defendant's "fruit of the poisonous tree argument plainly collapses since . . . his Fourth Amendment rights were never violated").

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 15] to suppress statements be **DENIED**.

## III.   Conclusion

Based on the foregoing cited authority and for the reasons stated, the court **RECOMMENDS** that Defendant's motions [Docs. 14 and 15] to suppress evidence and statements be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

26

**SO RECOMMENDED** this 26th day of December, 2019.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE